## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, )
                                 )
        **Plaintiff,**        )
                                 )
**v.**                             )      **CASE NO.  23-cr-60170-RNS**
                                 )
                                 )
**ALEXANDRA ACOSTA,**     )
                                 )
        **Defendant.**      )
_____)

## DEFENDANT'S MOTION FOR DOWNWARD VARIANCE

## AND SENTENCING MEMORANDUM

COMES NOW, the Defendant, ALEXANDRA ACOSTA ("Acosta"), by and through the undersigned attorney, and respectfully motions this Court to grant a downward variance and impose a sanction limited to a term of probation in lieu of the 8-14 months of incarceration proposed by the sentencing guidelines. In support thereof, Acosta respectfully states as follows:

## INTRODUCTION

1.      According to the Pre-Sentence Investigation Report ("PSR") produced in the instant case, Acosta scores a final offense level of 11 and a criminal history

category of I (she has no criminal history). As a result, the sentencing guidelines recommend a sanction of 8-14 months in prison. Acosta respectfully seeks a downward variance based on the factors enumerated in *18 U.S.C. 3553(a)* including her personal characteristics, history of dedicated public service and community service, as well as the hardship her family would incur, should she be incarcerated, relating to caring for her four year old son who has a medical condition that requires constant care.

2.     Acosta respectfully asks the Court to downward vary from Offense Level 11 to Offense Level 8 and sentence her to a term of probation. Acosta also wishes to perform community service.

## MEMORANDUM OF LAW

3.     When imposing a sentence, a court must consider the sentencing guidelines and calculate a total offense level and a criminal history category. However, the sentencing guidelines are merely "advisory" and sentencing courts must also consider the factors listed in *18 U.S.C. 3553(a)*, *U.S. v. Booker*, 543 U.S. 220, 245-246 (2005). When imposing a sentence, the Court shall impose a sentence that is sufficient, but not greater than necessary. *18 U.S.C. 3553(a)*

4.     The Eleventh Circuit has held that "a District Court may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must

also consider in calculating the defendant's sentence." *U.S. v. Hunt*, 459 F.3d 1180, 1185 (11th Cir. 2006).

5.    In *Pepper v. United States*, 562 U.S. 476, 480, 131 S. Ct. 1229, 1235 (2011), the U.S. Supreme Court stated,

> This Court has long recognized that [1] sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant--if not essential--to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* quoting *Williams v. New York*, 337 U.S. 241, 246-247 (1949)

6.    The U.S. Supreme Court further opined:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider **every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue**." *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." Williams, 337 U.S. at 247, 69 S. Ct. 1079, 93 L. Ed. 1337; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S. Ct. 59, 82 L. Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

*Pepper* at 487-88.

7.     Acosta presents before this Court for sentencing following her conviction at trial. As will be explained below, Acosta asks this Court to grant her a downward variance and impose a sanction that is limited to probation.

## BASIS FOR DOWNWARD VARIANCE

### I.     Acosta's Academic and Athletic Background

8.     Ever since a young age, Acosta has exhibited great drive and determination, work ethic, athleticism, and academic excellence. She truly is the kind of person who sets high goals for herself and then works as hard as possible to attain those goals and excel at whatever it is she is working towards. When she graduated high school, she was awarded "Best All Around" student acknowledging her achievements both academically and athletically. By the time she graduated, she had done so well academically that she earned 6 college credits for successfully completing advanced placement courses. Following high school, Acosta was awarded a *Florida Bright Futures Scholarship*[1] as well as a softball scholarship to attend Lynn University.  While attending Lynn University in 2005, Acosta started every game as the shortstop for their National Championship softball team. For her

---

[1] The *Florida Bright Futures Scholarship Program* establishes lottery-funded scholarships to reward Florida high school graduates for high academic achievement. (https://www.floridastudentfinancialaidsg.org/SAPBFMAIN/SAPBFMAIN)

performance, she was selected "all-tournament" during the national championship tournament, which means she was one of the top five players in the national tournament. Thereafter, Acosta transferred and graduated from Valdosta State University, where she was a two-time *All-American Shortstop*, *Defensive Player of the Year*, *Most Valuable Player*, and two-time *Gulf South Conference Player of the Year*. In 2014, she was even inducted into the Valdosta State University Athletic **Hall of Fame**. Out of a desire to share her knowledge of softball, Acosta later became a softball coach and teacher at Lowndes High School, located in Valdosta, GA.


## II.   <u>Acosta's History of Public Service</u>

9.     Prior to her arrest in the instant case, Acosta dedicated more than 10 years of her life serving the community as a Deputy Sheriff at BSO. Acosta pursued a career in law enforcement because she believes in the mission of law enforcement and believes strongly in public service. Given her personality and character, this career path was not only a natural one, but one she excelled at. Acosta took great personal satisfaction from her work in law enforcement and was proud to serve the community in that capacity. <u>Acosta cherished her career deeply.</u> It is a career she took very seriously, a career she devoted herself to wholeheartedly, and a career that she truly excelled at – *all to the great benefit of the communities she served*.

10.     Acosta's law enforcement career began in October 2011 when she attained employment with the LIGHTHOUSE POINT POLICE DEPARTMENT ("LHPD"). During her time at LHPD, Acosta worked as a station house officer and as a public safety communicator (dispatcher). On October 30, 2012, Acosta began her studies at the Broward Police Academy. On April 17, 2013, Acosta graduated from the police academy with great distinction. She was voted class president by her peers, was the academic award winner, and the top overall cadet. Acosta submitted her application with BSO the day after graduation.

11.     In support of her BSO application, Acosta submitted reference letters from an instructor at the police academy and two supervisors at LHPD who made the following observations of her character and performance:

### Deputy Ian Hunt

I am an eleven-year deputy with the Broward Sheriff's Office, police trainer, and have been one of only three class supervisors at the Broward College Police Academy for the past three years. For six months, while at the police academy, I supervised Alexandra on a daily basis while she was training to be a police officer.

Alexandra has a positive attitude in everything that she does, regardless of the level of challenge. Even with the stress of the academic and physical requirements of the Academy, she kept a smile on her face, encouraging attitude toward her peers and a strong work ethic. Her academic GPA was the highest of 26 cadets in the 285th Academy, and she scored very highly on the physical profile as well. Alexandra was well respected by her

classmates, and by the instructors, served as her class president, and frequently took leadership roles when the company commander was unable to do so.

Based on my experience supervising Alexandra, I give her my strong personal recommendation…

### Corporal M. Search

Alex is an extremely dedicated and responsible worker. She has excellent verbal and communication skills, can work independently and can multi-task ensuring that all assignments are completed in a timely and efficient manner. During her time at the Lighthouse Point Police Department, she always exhibited a professional work ethic. She was extremely courteous and got along well with others.

Alex has built and maintained an excellent rapport within our department. I have no doubt that she will be a great asset to any department that she becomes part of. I strongly recommend her for any endeavor that she chooses to pursue.

### Officer Carmen Roldan

I worked for New York Police Department for 20 years and was detached to the DEA for 14 years. I have currently been working for the Lighthouse Point Police Department for six and a half years… I have known Alex Acosta since she began working as a Station House Officer for the Lighthouse Point PD… Alex is a very hard-working individual who is always a pleasure to be around.

As a dispatcher she always did her best to complete any assignment I asked for in a timely fashion… Alex was always willing to help with any tasks to make our job easier as officers…

Alex would be an asset to your department. I feel that if given the opportunity she would excel as a Deputy Sheriff and do an excellent job representing the Broward Sheriffs Office…

**Exhibit 1 (LHPD Recommendation Letters)**

12.     BSO subsequently offered Acosta employment as a Deputy Sheriff which she graciously accepted. On June 3, 2013, Acosta began her first day at work as brand new Deputy Sheriff. She was first assigned to road patrol in the West Park/Pembroke Park district. While assigned to road patrol in West Park, she received two employee of the month awards and two commendations for her actions during certain incidents in West Park. There were several instances where she put others well-being before her own. In one instance, Acosta ran into a burning house and removed a family from the home in the middle of the night. In another incident, she responded to a call where three juveniles had been shot. With the possibility that the shooter was still in the vicinity,  Acosta applied tourniquets to the three juveniles who had been shot while the possibility that the shooter was still nearby. There is no question that her brave actions saved the lives of those children. In another incident, she assisted a fellow deputy who was confined in a backyard while other deputies were actively being shot at. Even from her first assignments as a road patrol deputy, Acosta consistently proved to be a very brave deputy who assumed great personal risk to save others.

13.     While on road patrol, she used her personal time to train with the K-9 unit because she was interested in becoming a K-9 handler. From 2014-2017, Acosta was also assigned to BSOs Quick Response Force[2] ("QRF"). In June 2017, Acosta was 1 of 6 deputies selected to attend BSO's very physically demanding Incident Containment Team[3] ("ICT") school in Miami-Dade County. She was ultimately one of four students to graduate and one of two selected to serve on BSO's ICT K-9 component.

14.     The employee performance reviews that were written to memorialize her performance show that Acosta <u>consistently</u> either met BSO's expectations or exceeded them. **Exhibit 2 (BSO Employee Reviews)** In a review from May 2022, Acosta's performance as a Deputy Sheriff was described as follows:

> Deputy Alexandra Acosta is an exceptional employee. She is a Vapor Wake handler for ICT[4]. Her, along with her partner "Bronx", keep a high standard in areas of training and daily operations.

---

[2] Quick Response Force members respond to critical incidents throughout Broward County to provide tactical assistance to other units responding to very dangerous situations.

[3] ICT is a specialized tactical unit BSO created in response to an active shooter incident that resulted in multiple deaths at Fort Lauderdale International Airport ("FLL"). ICT's job is to patrol FLL to protect the public and dignitaries, such as the President of the United States, from active shooters, terrorists, and other threats.

[4] A "Vapor Wake Handler" is a specialized canine handler whose job is to interdict suicide bombers and other terrorists who possess concealed explosives at the airport.

Deputy Acosta regularly conducts terminal, vehicle, and curbside sweeps. She prepares and plans out many of ICT's dignitary protection details. We receive several compliments from other agencies when Deputy Acosta helps with these protection details. Due to her knowledge and tactical ability, she is also tasked with assisting in fugitive apprehensions here at FLL.

In November 2021, Deputy Acosta had little to no issues during her annual Vapor Wake Certification. After several days of intense testing, she and Bronx passed all the required tests. Furthermore, in the same month, Deputy Acosta instructed a Vapor Wake class for BSO's ICT school.

Deputy Acosta always ensures the passengers of FLL are safe and their property secure. She interacts with the public in a polite and professional manner. Deputy Acosta is an easy going individual that requires little supervision. She is a solid worker who continues to be a valuable part of the Incident Containment Team, Airport District, and the Broward Sheriffs Office.

**Exhibit 2 (BSO Employee Reviews)**

15.     In September 2018, while working on ICT at the airport, Deputy Acosta was informed that an adult male was found unresponsive inside the men's restroom located in FLL's Terminal 4. When she encountered the man, he was unresponsive with no pulse. A subsequent employee review described Acosta's conduct during the incident as follows:

Without hesitation, Deputy Acosta rendered aid by giving the subject CPR until rescue arrived. Nevertheless, the subject was transported to the hospital where he regained his pulse and regular breathing patterns. If it weren't for

Deputy Acosta's swift thinking and application of life saving tactics, this subject may not be alive today. It was her courageous act in reference to the listed incident, which earned her the Broward County Sheriff's Office Life Saving Award (03-1809-001983)."

*Id.*

16.     On February 21, 2018, Acosta (and other deputies) received a letter of commendation from BSO for their work in responding to a bomb threat that caused the emergency evacuation of three public schools during class. At the time, Acosta was working as a Vapor Wake Handler at FLL as described above. The letter of commendation noted the following:

On January 25, 2018, the Broward Sheriff's Office Bomb Squad responded to a bomb threat at Lauderdale Lakes Middle School and Boyd Anderson High School. Since there were three public schools in the same area, it created a challenge. Once all three schools were evacuated, a thorough search was conducted with the assistance from the Broward Sheriff's Office District 3, FLL TSA Dogs and Vapor Dogs, Fort Lauderdale Police Department, Sunrise Police Department, and Miramar Police Department. The operation was a success due to the teamwork and professionalism displayed by each K-9 team. At the conclusion of the operation, all students were able to safely and quickly return to their respective schools.

**Exhibit 3 (BSO Commendation Letter)**

It should be emphasized that responding to a bomb threat is one of the most dangerous jobs in law enforcement, yet it was one Acosta bravely attended to without

hesitation. She showed up and did her job to the best of her ability and it contributed the safe ending everyone prayed for.

17.     While working as a member of ICT at the airport, Acosta began to train for BSO's SWAT school tryouts. Ultimately, it took Acosta three years of dedicated work to make it to SWAT. This was no easy task and it required Acosta to balance her full-time work as a Deputy Sheriff with her full-time work as a mother to young children. It was like having three full-time jobs. Preparing for SWAT tryouts also required Acosta to adhere to a very disciplined training schedule, including inordinate amounts of long-distance running and other grueling physical training. An example of Acosta's perseverance is reflected in her efforts to make it to SWAT. Specifically, during her first tryout, Acosta failed because she missed her final test by only a few feet (she was required to carry a heavy weight a certain distance within a time-limit after being exhausted from other demanding physical challenges). However, this failure did not deter Acosta. In fact, it fueled her drive to succeed even further. She continued to train, work, and parent. She was later invited to attend a second SWAT tryout, which she passed. Upon entering and completing BSO's SWAT School, Acosta earned the distinction of being the very first female to do so in BSO history. At the time of her arrest in the instant case, Acosta was assigned to BSO's SWAT team.

### III.   <u>Acosta's Charitable Work</u>

18.    Despite her demanding work and personal life, Acosta still found time to volunteer. The following itemizes highlights of the many charitable events she participated in:

- Niko Softball Tournament benefitting a deceased firefighter's family. Participated annually since 2014.
- Robbie Love Softball Tournament 2017, 2018, 2019
- Torch Run, 2017-2021
- Ryan Owen's Memorial Run, 2019-2022
- Diabetes Walk, November 2022
- Volunteered at schools for career day since 2014
- Volunteered at St. David Church Carnival, Oct. 2023 and March 2023
- Did construction for Habitat for Humanity, 2007

### IV.   <u>Reference Letters from Family and Friends</u>

19.    Attached are reference letters from Acosta's friends, family, and coworkers. The following excerpts offer insight to the Court through the lens of the people that have firsthand knowledge of Acosta's character. **Exhibit 4 (Character Reference Letters)**

20.    The first comes from JAY SANTALUCIA ("Santalucia"), who was Acosta's first sergeant upon being hired at BSO and later, her sergeant a second time when she worked on BSO's Quick Response Force ("QRF") following:

I have known Ms. Acosta for over 11 years. During that
time, she has always been honest, loyal, and a dedicated
and caring mother.  Ms. Acosta has a great work ethic,
from working road patrol to the Incident Containment
Team to the SWAT Unit, she puts 100 percent into all of
her assignments. Ms. Acosta has always been a team
player and works well with her co-workers. I consider Ms.
Acosta a very responsible individual, she has always been
an upstanding person throughout the community and the
agency.

*Id.*

21.     The second letter was written by KAELA ALLISON ("Allison"), who

attended police academy with Acosta and who has known her ever since. Allison

expressed the following observations of Acosta's character:

We first met at the police academy, and from the very
beginning, I was struck by her leadership abilities,
unwavering integrity, and genuine nature. Alex and I
quickly became great friends, bonding over our shared
passion for our profession and our commitment to making
a positive difference in our community.

Throughout the years, Alex has consistently demonstrated
exceptional qualities that have earned her my deep respect
and admiration. Her dedication to her work and her
community is unparalleled, and she has always gone above
and beyond to serve and protect others. Alex's leadership
has been a source of inspiration to many, and her integrity
has been a guiding light in both her personal and
professional life.

It is extremely sad and disheartening to see Alex going
through this difficult situation. Alex has always been
someone I could depend on, and she has become like

> family to me. Her strength, resilience, and commitment to
> doing what is right are qualities that I deeply admire.
>
> Alex is not only a dedicated professional but also a loving
> and devoted mother. She balances the demands of her
> career with her responsibilities as a parent with grace and
> unwavering commitment. Her children are a testament to
> her nurturing and caring nature, and she has always strived
> to provide them with a stable and loving environment.

*Id.*

22.    RONNIE DIMLER ("Dimler") is a friend of Acosta who has known

her for the past ten years. The two met while Dimler was employed as a captain at

the Miramar Police Department. At the time, Acosta coached Dimler's daughter's

high school softball team. As they got to know each other, Acosta expressed her

interest in a career in law enforcement and Dimler mentored her as she pursued that

goal. In his letter, he highlighted the following:

> I have had the privilege of witnessing Alexandra "Alex"
> Acosta unwavering integrity, compassion, responsibility
> throughout our acquaintance. Alexandra "Alex" Acosta
> has always been a person of high moral character,
> displaying honesty and truthfulness in all of her
> interactions. Alexandra "Alex" Acosta has consistently
> shown respect for others, treating individuals from all
> walks of life with dignity and kindness.
> Based on my knowledge of Alexandra "Alex" Acosta, I
> firmly believe that the actions alleged in the charges
> against her are uncharacteristic of her true nature. I
> genuinely believe that Alexandra "Alex" Acosta is a
> person of integrity who made a mistake and is deeply
> remorseful for the consequences it has caused.

*Id.*

23.     Letters were also provided by Acosta's mother and uncle, who describe her as being a good person, a very hard-working goal driven individual, who is good natured, and with strong character. *Id.*

## V.     Acosta's Childcare Issues

24.     Acosta's son is a Type I diabetic. He is 4 years old. He attends school full time so that Acosta and her wife Erin, who is a sergeant at the Miramar Police Department ("Miramar PD"), are able to work. As working parents, they have to find the balance between work and caring for their son, who has a serious disease. They do not have a lot of help when it comes to watching their children when they are away from them because their family is very small and Acosta's wife's family resides out of state. Additionally, anyone who cares for their son has be educated on diabetes management because his condition can become life threatening very quickly. Since he is only 4 years old, he cannot manage the diabetes by himself and because he is so small, his blood sugar levels can vary much quicker than an adult which only exacerbates the risk to his health.

25.     Acosta and her wife have encountered great difficulty finding schools, camps, and after school care that will accept him because of the liability that comes with watching over him due to his condition. When schools and camps do accept him, Acosta must maintain constant contact with them because they leave medical

decisions to Acosta and her wife (they will not act independently and require a parent's involvement) even when a routine diabetes related snafu arises. Overall, there are very few people who can care for their son in their absence.

26.     If Acosta is incarcerated, it would create a substantial hardship for Acosta's wife, because she is expected to work the night shift in the coming months, (Miramar PD allowed Acosta's wife to switch from nights to days while the instant case was pending, however she is expected to be moved back soon). **Exhibit 5 (Letter from Amber Rhoads)**

## VI.   <u>Restitution</u>

27.     Restitution has already been paid in full and no amount is presently due. Shortly after Acosta's arrest, when she learned of the substance of the allegations against her, she quickly instructed the undersigned to inform the government that she intended to pay full restitution regardless of the outcome of her case. This decision was based on her realization that she was given a loan that she was not entitled to receive and which she therefore had a duty to repay. This is significant because this sentiment was expressed long before she had any idea her case would proceed to trial or what the outcome of her case would be. Based on her instructions, the undersigned advised the government of Acosta's intentions during his first communication with them about this case and before any other issue was ever

discussed. Acosta never veered from this decision and ultimately made full restitution payment to the SMALL BUSINESS ADMINISTRATION ("SBA"). Had it been easier to pay back the SBA, Acosta would have paid them sooner. However, it took the undersigned some time to identify and contact the appropriate officials to make the necessary arrangements.

## **CONCLUSION**

28.    Acosta has a documented and substantial history of public service and charitable work for more than 10 years prior to her arrest in this case. She has been recognized over and over again for her consistent exemplary work as a Deputy Sheriff, including for saving a man's life at the airport and searching a school for bombs at her own peril. Not to mention, she bravely put herself in harm's way to assist her fellow deputies when they were in trouble.

29.    Every day Deputy Acosta went to work she assumed an inherent risk to her safety and her own life, especially when she served on ICT and SWAT. Where the undersigned's job requires the donning of a suit and tie, Acosta's job required her to wear a ceramic ballistic vest and helmet, carry multiple firearms, as well as emergency life-saving equipment such as tourniquets, chest seal, and quick clot bandages.

30.    From her early days as a cadet at the police academy, to her performance on ICT and her graduation from SWAT school, Acosta was recognized

for her dedication, work ethic, professionalism, and the very high quality of her work product – all of which comprise the *service* part of "public service" and "community service".

WHEREFORE, the Defendant and the undersigned attorney respectfully motion this Court to grant a downward variance and impose a sanction limited to a term of probation in lieu of the 8-14 months of incarceration proposed by the sentencing guidelines.

Respectfully Submitted,

/s/ *Brian Silber*

_____

**Brian Silber, Esq.**
Counsel for Alexandra Acosta
Florida Bar #:  0640646
916 South Andrews Avenue
Fort Lauderdale, FL 33316
954-462-3636 (ofc)
silberlaw@gmail.com
briansilberlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this document was served on the following parties via CM/ECF on August 15, 2024.

<u>**SERVICE LIST**</u>

**AUSA Trevor Jones**
U.S. Attorney's Office SDFL
500 E. Broward Blvd, 7th Floor
Ft. Lauderdale, FL 33394
786-564-9109
trevor.jones@usdoj.gov